IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

CITIZENS INSURANCE COMPANY OF   *
AMERICA and THE HANOVER   *
INSURANCE COMPANY,   *
  *
    Plaintiffs,   *     CV 123-110
  *
      v.   *
  *
AUGUSTA CHILLER SERVICE, INC.,   *
et al.,   *
  *
    Defendants.   *
  *

## O R D E R

Before the Court is Citizens Insurance Company of America ("Citizens") and The Hanover Insurance Company's ("Hanover") (collectively, the "Insurers") motion for summary judgment. (Doc. 53.) For the following reasons, the Insurers' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

This declaratory judgment action arises from two underlying state court actions sharing a common nucleus of facts.

### A. Underlying State Court Actions

The underlying state court actions, <u>Broadwater, et al. v. Augusta Chiller Service, Inc.</u>, No. 2023RCCV00563, Superior Court of Richmond County, Georgia (the "Broadwater Lawsuit") and <u>Lee, et</u>

al. v. The Augusta-Richmond Coliseum Authority, et al., No. 2023RCCV00538, Superior Court of Richmond County, Georgia (the "Lee Lawsuit"), (collectively, the "Underlying Lawsuits") arise from an incident that occurred at the James Brown Arena (the "Arena") in Augusta, Georgia on November 18, 2022. (Doc. 54, at 5; Doc. 59-1, at 4.)  At the time, Defendant Augusta Chiller Service, Inc. ("ACS"), which designs, installs, maintains, and services chiller systems, was contracted to perform services at the Arena. (Doc. 54, at 6.)  Those services included preventative and on-demand maintenance of a chiller system located in the basement chiller room at the Arena. (Id.)

The operative complaint in the Broadwater Lawsuit alleges the following.  On November 18, 2022, Rex Broadwater ("Broadwater") was employed by Global Spectrum, LP ("Global"), a venue management and event programming company, as a maintenance manager and was working at the Arena. (Doc. 59-1, at 3-4.)  While working at the Arena, Broadwater entered the chiller room because he heard a hissing noise coming from inside. (Id. at 4.)  Upon entering, he saw a gas, later determined to be Freon, escaping the chiller and called ACS to report the issue. (Id. at 4, 6.)  An ACS employee told Broadwater to turn off the chillers and evacuate the building. (Id. at 4.)  The ACS employee gave Broadwater no warning as to the harmful effects of Freon or what proper protective equipment he should use when working with it. (Id.)  Broadwater identified and

attempted to plug the hole from which the gas was leaking and then evacuated the building. (Id.) Broadwater evacuated into an exterior stairwell which, unbeknownst to him, the air from the chiller room was vented into. (Id.) Broadwater was later found unresponsive in the stairwell and died "[a]s a direct and proximate result of the displacement of oxygen caused by the Freon that was escaping from the chiller room and being vented to [the stairwell]." (Id. at 5.) According to the complaint, the leak in the chiller room was caused by a relief valve on the chiller not having the proper plug, which resulted in Freon, a refrigerant, escaping from the valve. (Id.) On May 18, 2023, Broadwater's surviving spouse and the administratrix of his estate (the "Broadwater Defendants") brought the Broadwater Lawsuit against ACS, asserting claims for negligence, wrongful death, survivorship and estate claims, and punitive damages. (Doc. 29-1, at 5-9.)

The complaint in the Lee Lawsuit tells a similar story. The plaintiffs in the Lee Lawsuit are various individuals, each of whom were working at the Arena on November 18, 2022. (Doc. 29-2, at 3.) The plaintiffs allege that while working at the Arena that day, they were exposed to the Freon from the leak discussed above. (Id. at 5-6.) They further allege exposure to the Freon caused them to seek medical attention and treatment and cancel the concert scheduled to take place at the Arena that evening. (Id. at 6.) They filed suit on November 2, 2023 against the Augusta-Richmond

Coliseum Authority, the operator of the Arena; Global, Broadwater's employer; and ACS, asserting various claims for negligence and breach of contract. (Id. at 3-4, 6-10.)

At all relevant times, ACS was insured under various policies, including a Commercial General Liability Coverage Policy issued by Citizens, Policy No. ZBA-D848851 (the "Primary Policy"), and a Commercial Follow Form Excess and Umbrella Policy issued by Hanover, Policy No. UHA D848852 00 (the "Excess Policy"). (Doc. 54, at 1-2.)

## B. The Declaratory Judgment Action

The Insurers filed the instant suit seeking declaratory judgment that they have no duty to defend or indemnify ACS in the Underlying Lawsuits. (See Doc. 29.) The Primary Policy contains the following coverage:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

(Doc. 29-3, at 168.) The Primary Policy also contains a pollution exclusion. (Id. at 197.) Per the exclusion, the insurance does not cover "'[b]odily injury' or 'property damage' which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or

escape of 'pollutants' at any time." (Id.) "Pollutants" are defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Id. at 182)

The Excess Policy contains the following additional coverage:

**1. Coverage A – Follow Form Excess Liability Insuring Agreement**
a. We will pay on behalf of the insured those sums in excess of the "underlying insurance" which the insured becomes legally obligated to pay as damages, provided . . . (1) Such damages are covered by "underlying insurance" . . . .

**2. Coverage B – Umbrella Liability Insuring Agreement**
a. We will pay on behalf of the insured those sums in excess of the "retained limit" shown in the Declarations which the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage", "personal injury" and "advertising injury" to which this coverage applies . . . .

(the former, "Coverage A," and the latter, "Coverage B"). (Doc. 29-4, at 14.) Coverage A includes a pollution exclusion substantively identical to that in the Primary Policy, providing that coverage does not apply to any covered injury "which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." (Id. at 34.) Coverage B contains a slightly different pollution exclusion, which reads in relevant part: "This insurance does not apply to . . . '[b]odily injury', 'property damage', 'personal injury,' or 'advertising

injury' part (sic) but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." (<u>Id.</u> at 22, 24.) The Excess Policy defines "pollutants" the same as the Primary Policy. (<u>Id.</u> at 31.)

Both Coverage A and Coverage B also include exclusions for professional services. Coverage A's exclusion states the coverage does not apply to

> Any liability or expense arising out of the rendering of or failure to render any professional service, advice or instruction by you or on your behalf, or from whom any of you assumed liability by reason of a contract or agreement, regardless of whether any such service, advice or instruction is ordinary to any insured's profession.

(<u>Id.</u> at 35.) Coverage B's exclusion, which is nearly identical, reads it does not apply to

> Any liability or expense arising out of the rendering of or failure to render any professional or quasi-professional service (whether or not such service requires certification or licensing), advice or instruction by you or on your behalf, or from whom any of you assumed liability by reason of a contract or agreement, regardless of whether such service, advice or instruction is ordinary to any insured's profession.

(<u>Id.</u> at 24.)

The Insurers filed this motion for summary judgment on July 1, 2024, arguing (1) Citizen and Hanover have no duty to defend or indemnify ACS in the Underlying Lawsuits based on the pollution exclusions in the Primary and Excess Policies, and (2) Hanover has no duty to defend or indemnify ACS based on the professional

service and liability exclusions contained in the Excess Policy. (Doc. 53, at 2.)  The Broadwater Defendants and ACS (collectively, the "Defendants") responded in opposition (Doc. 59; Doc. 62), and the Insurers replied in support (Doc. 63).

## II. LEGAL STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Facts are "material" if they could "affect the outcome of the suit under the governing [substantive] law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a dispute is genuine "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001) (citation omitted).  The court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [the nonmoving party's] favor," United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted). The court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Because the standard for summary judgment mirrors that of a directed verdict, the initial burden of proof required by either party depends on who carries the burden of proof at trial. Id. "When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it 'must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial.'" Four Parcels of Real Prop., 941 F.2d at 1438 (emphasis omitted and alteration adopted) (quoting Celotex Corp., 477 U.S. at 331 (Brennan, J., dissenting)). "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" Id. (quoting Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1477 (11th Cir. 1991)).

In this action, the Clerk of Court gave Defendants notice of the motion for summary judgment and informed them of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 56.) For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The

time for filing materials in opposition has expired, the issues have been thoroughly briefed, and the motion is now ripe for consideration.

### III. DISCUSSION

The Court first addresses the Insurers' motion with respect to their duty to indemnify, and then turns to their duty to defend.

**A. Duty to Indemnify**

The Insurers seek summary judgment as to both their duty to defend and their duty to indemnify under the Primary and Excess Policies. (Doc. 53, at 2.) ACS argues that the issue of indemnification is not yet ripe for adjudication. (Doc. 62, at 8.)

While the Insurers largely address the two duties together, it is well established that "the duty to defend and the duty to indemnify are distinct and analyzed separately." Essex Ins. Co. v. Sega Ventures, LLC, No. CV413-253, 2015 WL 1505979, at *3 (S.D. Ga. Mar. 31, 2015) (citing City of Atlanta v. St. Paul Fire & Marine Ins. Co., 498 S.E.2d 782, 785 (Ga. Ct. App. 1998)). This distinction is important, as "[d]istrict courts have frequently heeded the Eleventh Circuit's cautionary advice and declined to decide questions of indemnification liability while the underlying action is still pending." Id. (declining to address duty to indemnify while underlying suit was ongoing); Sparta Ins. Co. v.

*Guardian Servs., Inc.*, No. 1:19-CV-260, 2020 WL 9814218, at *6 (S.D. Ala. Mar. 19, 2020) ("[T]he duty to indemnify is not ripe for adjudication until the insured is in fact held liable in the underlying suit.") (citation omitted).  Based on the foregoing, the Court will follow the Eleventh Circuit's guidance and address the duty to indemnify and duty to defend separately.  Moreover, because it is undisputed ACS has not been held liable in the Underlying Lawsuits, the Court finds determination of the Insurers' duty to indemnify not yet ripe for adjudication.  (Doc. 62-1, at 2; Doc. 54, at 5.)  Thus, the Insurers' motion for summary judgment as to their duty to indemnify is **DENIED**.

## B. Duty to Defend

The Court now turns to the Insurers' duty to defend.  The Parties disagree as to whether the Freon leak implicates exclusions in the Primary and Excess Policies. (Doc. 53, at 10-14; Doc. 59, 3-10; Doc. 62, 11-23.)  Accordingly, the questions before the Court are ones of contract interpretation.  As this is a diversity jurisdiction case, the Court is bound by the applicable state law governing the contract.  *Giddens v. Equitable Life Assurance Soc'y of the U.S.*, 445 F.3d 1286, 1297 n.9 (11th Cir. 2006) (citation omitted).  The Parties agree Georgia law controls.  (See Doc. 53; Doc. 59; Doc. 60.)

Under Georgia law, the construction of a contract "is a question of law for the court."  *Am. Empire Surplus Lines Ins. Co.*

v. Hathaway Dev. Co., 707 S.E.2d 369, 371 (Ga. 2011) (citation omitted). Insurance policy interpretation "is a matter of contract and the parties to the contract of insurance are bound by its plain and unambiguous terms." Hurst v. Grange Mut. Cas. Co., 470 S.E.2d 659, 663 (Ga. 1996) (citation omitted). "Words used in the policy are given their usual and common meaning, and the policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney." Liberty Surplus Ins. Corp. v. Norfolk S. Ry. Co., 684 F. App'x 788, 790 (11th Cir. 2017) (citation omitted and alterations adopted). An insurance company may "fix the terms of its policies as it sees fit, so long as they are not contrary to the law," and it is "free to insure against certain risks while excluding others." Ga. Farm Bureau Mut. Ins. Co. v. Smith, 784 S.E.2d 422, 424 (Ga. 2016) (citations and internal quotation marks omitted).

Consistent with the general rule governing contract interpretation, construction of an insurance contract is a question of law. Elan Pharm. Research Corp. v. Emp'rs Ins. of Wausau, 144 F.3d 1372, 1375 (11th Cir. 1998). Under Georgia law, an insurer's refusal to defend is justified only if the complaint "does not assert any claims upon which there would be insurance coverage." City of Atlanta, 498 S.E.2d at 784 (citing Great Am. Ins. Co. v. McKemie, 259 S.E.2d 39, 40-41 (Ga. 1979)). Any doubt as to an insurer's duty to defend "should be resolved in favor of

11

the insured." Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc., 490 S.E.2d 374, 376 (Ga. 1997) (citations omitted). To succeed on summary judgment, an insurer must show the terms of the policy "unambiguously exclude coverage." BBL-McCarthy, LLC v. Baldwin Paving Co., 646 S.E.2d 682, 685 (Ga. Ct. App. 2007) (quoting Penn-Am. Ins. Co., 490 S.E.2d at 376).

Under Georgia contract law, the first question is whether the terms contained in a policy's exclusions are unambiguous: "Where the contractual language is explicit and unambiguous, 'the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured.'" Jones v. Golden Rule Ins. Co., 748 F. App'x 861, 864 (11th Cir. 2018) (quoting Smith, 784 S.E.2d at 424). As such, in determining whether the relevant terms are unambiguous, the Court looks to the text of the policies. Smith, 784 S.E.2d at 424 (citation omitted).

### 1. Pollution Exclusions

The Insurers argue they are entitled to declaratory judgment that they have no duty to defend under the Primary and Excess Policies' pollution exclusions. (Doc. 53, at 10-12.) Defendants do not dispute that Freon is, by definition, a pollutant, but disagree that the exclusion is applicable, relying on the Georgia Court of Appeal's holding in Barrett v. Nat'l Union Fire Ins. Co. of Pittsburgh to argue the injuries were not caused by the

"pollutant," but rather by a lack of oxygen.  (Doc. 59, at 4-6 (citing 696 S.E.2d. 326, 330 (Ga. Ct. App. 2010)); Doc. 62, at 12-17.)

The Court agrees with the Insurers.  In Barrett, the plaintiff suffered a brain injury after working on a gas line for several hours.  696 S.E.2d at 328.  The injury occurred because the natural gas emitted from the pipe created an oxygen-deficient atmosphere inside the poncho plaintiff wore.  Id.  Important to the court's analysis was that two other individuals worked on the pipe for shorter intervals immediately before the plaintiff and were not injured.  Id.  The court found the claims did not fall within the relevant policy's pollution exclusion "[b]ecause the allegations of the complaint indicate that the release of the natural gas, standing alone, did not cause [the plaintiff's] injuries."  Id. at 332.

Despite the "standing alone" language in Barrett, several courts in this Circuit have since clarified the pollutant need not be the sole cause, but only a but-for cause of the injury.  See Evanston Ins. Co. v. Sandersville R.R. Co., No. 5:15-CV-247, 2016 WL 5662040, at *9 (M.D. Ga. Sept. 29, 2016) ("[T]o suggest that but-for causation has somehow come to mean sole causation would turn the whole concept of causation on its head."); see also Love Lang v. FCCI Ins. Co., 530 F. Supp. 3d 1299, 1314-16 (N.D. Ga. 2021) (providing an overview of "but-for" causation and explaining

that a pollutant was a but-for cause because, in the absence of
its release, the alleged negligence would not have caused the
injury) (citations omitted). Here, the pollutant exclusions in
the Primary Policy and Coverage A unambiguously support this
understanding by excluding coverage for "[injuries] which would
not have occurred *in whole or in part* but for the [pollutant]."
(Doc. 54, at 2-3 (emphasis added)); see also Evanston Ins. Co. v.
Xytex Tissue Servs., LLC, 378 F. Supp. 3d 1267, 1290 (S.D. Ga.
2019) (finding "in whole or in part" broadened causation). Thus,
Plaintiff need only show the release of the Freon was a partial,
but-for cause of the injuries for the exclusions to apply.

With respect to Coverage B, ACS contends the pollution
exclusion is ambiguous because it inadvertently omits the words
"which would not have occurred in whole or in." (Doc. 62, at 3;
Doc. 62-2, at 3.) Under Georgia law, "[a]n ambiguity exists . .
. when the plain words of a contract are fairly susceptible of
more than one meaning." Alea London Ltd. v. Am. Home Servs., Inc.,
638 F.3d 768, 773 (11th Cir. 2011) (citation omitted). To
determine whether the language is ambiguous, the court must apply
the rules of contract construction to determine the intended
meaning, which includes examining the contract as a whole. Id.
(citations omitted); see Love Lang, 530 F. Supp. 3d at 1306
("[O]nly if the contract is still ambiguous after applying the
rules of construction, the issue [of ambiguity] must be resolved

by the jury" (citation and internal quotation marks omitted)).
When reading the Excess Policy as a whole, the Parties' intended
meaning is clear for several reasons.  First, the omission is
obviously a typographical error, as reading the term as written
does not make sense nor is it grammatically correct.  Further, the
exclusion language in Coverage B is otherwise identical to that in
Coverage A.  Thus, the only reasonable interpretation of Coverage
B is to read in the omitted language so that it mirrors Coverage
A.  The affidavit of John Lyons, Hanover's vice president,
clarifies that the omission was the result of a formatting error.
(Doc. 54-1, at 3.)  Moreover, any ambiguity would be related solely
to the causation language and therefore immaterial, as policies
without the language "in whole or in part" have similarly been
determined to require only but-for causation.  See, e.g.,
Sandersville, 2016 WL 5662040, at *9 (finding "arising out of" to
require only but-for causation, not sole causation).  Even with
the omission, the critical causation language — "but for" — is
present in Coverage B.

Here, it is clear based on the allegations of the complaint
the Freon leak was a but-for cause of the injuries suffered.  In
the Broadwater Lawsuit, the complaint alleges Broadwater was
injured "[a]s a direct and proximate result of the displacement of
oxygen *caused by the Freon that was escaping . . ..*" (Doc. 59-1,
at 5.)  The complaint in the Lee Lawsuit even more

straightforwardly alleges the plaintiffs "were exposed to [the Freon] leak during the time in which they were at the venue and had to seek medical attention and treatment." (Doc 29-2, at 6.) These allegations make clear the injuries in the Underlying Lawsuits would not have occurred "but for — that is, in the absence of — the release of the [Freon.]" Love Lang, 530 F. Supp. 3d at 1299 (finding exposure to pollutant a but-for cause despite alleged acts of negligence also occurring); Sandersville, 2016 WL 5662040, at *9 ("[B]ut-for causation broadly defines causation, requiring only an act or omission without which the event would not have occurred").[1]

Moreover, in cases like Barrett, where courts have found a question of fact as to whether the pollutant was a but-for cause of the injury, the analyses have turned largely on the fact the plaintiff "could have worked safely in the presence of the gas," because the gas was not independently harmful. 696 S.E.2d at 332 (finding question of fact as to whether natural gas was sole cause of injury because others worked in its presence without harm); Xytex, 378 F. Supp. 3d at 1290 ("The record demonstrates that

---

[1] The Broadwater Defendants argue Dr. Rochelle Simon's affidavit supports the conclusion that Broadwater's death was caused by oxygen displacement rather than Freon. (Doc. 59, at 6.) However, the affidavit supports, rather than contradicts, finding Freon was a but-for cause, reading in relevant part, "[Broadwater's] death was the result of the presence of Freon in his blood," and "hypoxia may have been a *contributing factor*." (Doc. 59-2, at 3 (emphasis added).) When read in full, her statements make clear the Freon leak was, at minimum, a partial but-for cause.

whether the release of nitrogen was a partial but for cause of the injuries is in dispute because nitrogen is naturally harmless"). Freon, however, is not a "naturally harmless" substance. See Poole v. State, 548 S.E.2d 113, 115 (Ga. Ct. App. 2001) (citing drug expert's testimony that Freon is an "aerosol inhalant" subject to abuse and causes impairments when inhaled); Saldivar v. Munch, No. 11-80441-CIV, 2011 WL 13227967, at *3 (S.D. Fla. Dec. 19, 2011) (relying on an investigator's report which states inhaling Freon may result in disorientation and, in high concentrations, cardiac dysrhythmia and sudden death to determine the cause of an accident); United States v. Morrissette, 579 F. App'x 916 (11th Cir. 2014) (noting the release of Freon, a refrigerant, violated the Clean Air Act because it constituted a hazardous air pollutant). ACS seemingly attempts to argue Freon is not harmful by arguing "[p]eople work with Freon all the time without dying." (Doc. 62, at 15.)  However, this unsupported assertion does not negate the fact that Freon is a well-known, harmful chemical that is dangerous to ingest, as evidenced by a plethora of case law dealing with Freon's harmful effects and the medical examiner's finding that the presence of Freon in Broadwater's blood caused his death. (Doc. 59-2, at 3.)

Defendants also argue Freon should not fall within the pollution exclusion on public policy grounds. (Doc. 59, at 6-8; Doc. 62, at 22.)  They contend including Freon under the pollution

exclusion goes against the insured's reasonable expectations of coverage because Freon is ACS's main product, and, as such, an exclusion of coverage for injuries related to Freon would render the Policies illusory. (Doc. 59, at 6-8; Doc. 62, at 22.) However, the insured's reasonable expectations and the "main product" inquiry are considered when a policy's plain language is deemed ambiguous. See Auto-Owners Ins. Co. v. Neisler, 779 S.E.2d 55, 59 (Ga. Ct. App. 2015); Xytex, 378 F. Supp. 3d at 1287-88 (considering insured's reasonable expectations because definition of "pollutant" was ambiguous); Barrett, 696 S.E.2d at 330 (applying "main product" test in determining whether natural gas was a "pollutant" in face of ambiguity).  Absent ambiguity,

> a contract cannot be said to be contrary to public policy unless the General Assembly has declared it to be so, or unless the consideration of the contract is contrary to good morals and contrary to law, or unless the contract is entered into for the purpose of effecting an illegal or immoral agreement or doing something which is in violation of the law.

Love Lang, 530 F. Supp. at 1313-14 (citations omitted).  Here, the Insurers do not dispute Freon falls within the definition of "pollutant," but rather, whether the injuries resulted from the exposure to such; thus, there is no ambiguity to be resolved. (Doc. 53, at 4-6.)  Moreover, interpreting the pollution exclusions to include Freon-related injuries does not render them illusory, as the Policies still cover a host of other injuries that may occur in providing on-site services.  Therefore, Defendants arguments

are inapplicable, and the exclusion is not invalid as contrary to public policy.

Finally, ACS argues the pollution exclusion is inapplicable to the Lee Lawsuit because the plaintiffs seek economic damages that arose from cancelling the concert, not the Freon leak. (Doc. 62, at 16-17.) However, ACS makes no suggestion these injuries would be "personal or advertising injuries," and upon review of the definition, they do not fall within such category. (<u>See</u> Doc. 29-3, at 182.) Thus, to fall within the Policies' scope of coverage the economic damages would need to be "property damages." (<u>See</u> Doc. 29-3, at 168; Doc. 29-4, at 14.) However, "property damages," as defined in the Policies, are still subject to the pollution exclusions. (<u>See</u> Doc. 29-3, at 197; Doc. 29-4, at 22, 24, 24.) And, but for the Freon leak, the concert would not have been cancelled. Thus, the inclusion of economic damages stemming from the concert cancellation does not change the Court's findings herein. As such, the Insurers' motion for summary judgment as to their duty to defend under the Primary and Excess Policies' pollution exclusions is **GRANTED**.

2. <u>Excess Policy's Professional Liability Exclusions</u>

Hanover also argues it has no duty to defend under the "Professional Services" exclusion in Coverage A and the "Professional Liability" exclusion in Coverage B of the Excess Policy (collectively, the "Professional Service Exclusions").

(Doc. 53, at 13-14.)   Defendants disagree, arguing the term "professional services" is ambiguous and should not be read to include the work of ACS and its employees.   (Doc. 62, at 18-22.)

As an initial matter, ACS argues this issue is not ripe for adjudication because Hanover's defense obligation has not yet been triggered.   (Doc. 62, at 17.)   Nonetheless, because Hanover has taken the position it has no duty to defend ACS and the Parties have fully briefed the issue, the Court addresses the merits of the Parties' arguments.   See Publix Super Markets, Inc. v. Fireman's Fund Ins. Co., No. 8:22-CV-2569, 2023 WL 6049680, *6 (M.D. Fla. Sept. 15, 2023) (discussing a split in approaches on the issue of ripeness for excess insurance policy disputes); see also Essex Ins. Co. v. Littlejohn, No. 1:15-cv-897, 2016 WL 5340543, *4 (N.D. Ga. Feb. 12, 2016) (finding duty to defend ripe because excess insurer denied coverage and disputed factual allegations).

The Court finds the undefined term "professional services" ambiguous because its meaning is not plain on its face and the intended meaning is not defined or explained in the policy. Compare Philadelphia Indem. Ins. Co. v. First Multiple Listing Servs., Inc., 173 F. Supp. 3d 1314, 1320 (N.D. Ga. 2016) (finding "professional service" ambiguous when completely undefined or unexplained) with Auto-Owners Ins. Co. v. State Farm Fire & Cas. Co., 678 S.E.2d 196, 199 (Ga. Ct. App. 2009) (finding "professional

service" unambiguous when policies included enumerated services to which the exclusion applied).  As such, the Professional Services Exclusions will be "liberally construed in favor of the insured and strictly construed against the insurer."  <u>W. Pac. Mut. Ins. Co. v. Davies</u>, 601 S.E.2d 363, 369 (Ga. Ct. App. 2004) (citation omitted).  In construing the exclusions against Hanover, the Court finds there is a question of fact as to whether the alleged acts of ACS constitute "professional services."  <u>See</u> <u>Cunningham v. Middle Georgia Mut. Ins. Co.</u>, 601 S.E.2d 382, 386 (Ga. Ct. App. 2004) (distinguishing between trade work and professional services); <u>see also</u> <u>Evanston Ins. Co. v. Budget Grp. Inc.</u>, 199 F. App'x 867, 868 (11th Cir. 2006) ("The term 'professional' refers to persons who belong to a learned profession or whose occupations require a high level of training and proficiency.") (citation omitted).  Hanover's motion for summary judgment as to the Professional Services Exclusions is therefore **DENIED**.


## V. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that the Insurers' motion for summary judgment (Doc. 53) is **GRANTED IN PART** and **DENIED IN PART**.  The Court finds, as a matter of law, the Insurers have no duty to defend ACS in the Underlying Lawsuits under the Primary and Excess Policies' pollution exclusions.  The

remainder of the Insurers' motion for summary judgment is **DENIED**.
The case shall proceed to trial in due course.

   **ORDER ENTERED** at Augusta, Georgia, this 24th day of March,
2025.

                                _____
                                HONORABLE J. RANDAL HALL
                                UNITED STATES DISTRICT JUDGE
                                SOUTHERN DISTRICT OF GEORGIA